## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

_____
                                                    )
JIANMING JIANG                                      )
                                                    )
LIGUO DING                                          )
                                                    )
CHUNQIU DUAN                                         )
                                                    )
YONGQIANG SONG                                       )
                                                    )
              Plaintiffs,                            )
                                                    )
       v.                                            )          Civil Action No. _____
                                                    )
MATSU CORP.                                          )
       d/b/a Matsu Sushi Restaurant                  )
       33 Jesup Road                                 )          December 4, 2017
       Westport, CT 06880                            )
                                                    )
KIM MING "MARTY" CHENG                               )
       6313 Boulevard E.                             )
       West New York, NJ 07093                       )
                                                    )
ZIQIAO "MICHAEL" CAO                                 )
       16 Woodhill Road                              )
       Trumbull, CT 06611                            )
                                                    )
              Defendants.                            )
_____)


## COMPLAINT AND JURY DEMAND

1.      The employers in this case tricked their employees into investing tens of

thousands of dollars into their restaurant on a promise that the money would be returned.   The

employers worked them long hours at sub-minimum wages, never paid a penny in overtime

premiums, and refuse to return the employees' money.  In fact, the employers threatened to

spend the employees' own money on lawyers in order to coerce those employees into quietly continuing to work in illegal and unfair conditions.

2.      Plaintiffs Jianming JIANG, Liguo DING, Chunqiu DUAN, and Yongqiang SONG are current and former workers at Matsu Sushi and Matsuri, two Japanese cuisine restaurants owned and operated by Defendants Kim Ming "Marty" CHENG and Ziqiao "Michael" CAO [hereinafter the "Bosses"].  Plaintiffs bring this action to recover unpaid wages, their deposit payments, as well as applicable liquidated and punitive damages, costs, and attorney's fees, pursuant to the Trafficking Victim Protection Reauthorization Act (TVPRA), 18 U.S.C. § 1589, the Fair Labor Standards Act (FLSA), 29 U.S.C. 201, *et seq.*, Connecticut wage statutes, 31 Conn. Gen. Stat §31-58, *et seq.*, The Connecticut Unfair Trade Practices Act (CUTPA), 42 Conn. Gen. Stat. 110, *et seq.*, and various common law causes of action.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this controversy pursuant to 29 U.S.C. § 216(b), 28 U.S.C. §§ 1331 and has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

4.      In the alternative, this Court also has jurisdiction over this controversy pursuant to 28 U.S.C. § 1332(a)(1)-(2) because Plaintiffs are completely diverse in citizenship from Defendants, and the amount in controversy exceeds $75,000.

a.   Plaintiffs Jianming Jiang, Liguo Ding, Chunqiu Duan, and Yongqiang Song, are domiciled in Flushing, Queens County, New York.

b.   Defendant Matsu Corp. is a stock corporation registered and located in Westport, Connecticut.

c.   Defendant Kim Ming Cheng is domiciled in West New York, New Jersey.

      d.   Defendant Ziqiao Cao is domiciled in Trumbull, Connecticut.

5.      Venue is appropriate pursuant to 28 U.S.C. § 1391(b) because the events giving rise to this complaint occurred within this judicial district.

## THE PARTIES

6.      Plaintiff Jianming Jiang worked as a hibachi chef at Matsu Sushi and Matsuri, two Japanese cuisine restaurants owned and operated by Defendants Kim Ming Cheng and Ziqiao Cao [hereinafter the "Restaurants"], from 2002 to 2011 and from October 2013 to the present. He is still currently employed at Matsu Sushi.  At all times relevant to this Complaint, Mr. Jiang was an employee within the meaning of the FLSA, 29 U.S.C. § 203(e)(1), and Conn. Gen. Stat. §§ 31-58(e) and 31-71a(2).

7.      Plaintiff Liguo Ding worked as a hibachi chef at the Restaurants from 2003 to 2009 and from March 2010 to the present.  Like Mr. Jiang, he is still employed at Matsu Sushi. At all times relevant to this Complaint, Mr. Ding was an employee within the meaning of the FLSA, 29 U.S.C. § 203(e)(1), and Conn. Gen. Stat. §§ 31-58(e) and 31-71a(2).

8.      Plaintiff Chunqiu Duan worked as a sushi chef and driver at the Restaurants from 2004 to 2010 and from April 2013 to April 2017.  At all times relevant to this Complaint, Mr. Duan was an employee within the meaning of the FLSA, 29 U.S.C. § 203(e)(1), and Conn. Gen. Stat. §§ 31-58(e) and 31-71a(2).

9.      Plaintiff Yongqiang Song worked as a sushi chef and driver at Matsu Sushi continuously from January 2011 to the present.  He is also still employed at Matsu Sushi.  At all times relevant to this Complaint, Mr. Song was an employee within the meaning of the FLSA, 29 U.S.C. § 203(e)(1), and Conn. Gen. Stat. §§ 31-58(e) and 31-71a(2).

10.     Defendant Kim Ming Cheng resides in West New York, New Jersey.  Mr. Cheng is the President and Director of Matsu Corp., doing business as Matsu Sushi restaurant.  Mr. Cheng also co-owned Matsu Grill Co. LLC, which operated the Matsuri restaurant.  Matsuri has since closed, and Matsu Grill Co. LLC is now defunct.

11.     Defendant Ziqiao Cao is a resident of Trumbull, Connecticut.  Mr. Cao is the co-owner of Matsu Corp., and jointly owned and operated Matsuri through Matsu Grill Co. LLC.

12.     Cao and Cheng made all relevant decisions, or delegated the power to make all relevant decisions, regarding hiring, payment of wages, scheduling, and work duties of Plaintiffs at Matsu Sushi and Matsuri.  Between the Restaurants, Cao and Cheng hired dozens of workers, including Plaintiffs, and oversaw all aspects of their work.  Therefore, at all times relevant to this Complaint, Cao and Cheng were employers within the meaning of the FLSA, 29 U.S.C. § 203(d), and Conn. Gen. Stat.  §§ 31-58(e) and 31-71a(1).

## STATEMENT OF FACTS

### I.     Background and Wage Claims

#### A.     *Matsu Corp. and Matsu Sushi*

13.     Matsu Corp. is a domestic corporation incorporated in Connecticut.  Its business address is 33 Jesup Road, Westport, CT 06880.

14.     Matsu Corp. does business as Matsu Sushi restaurant, which first opened in March 2002 and is still open today.

15.     Matsu Corp. has always done more than $500,000 per year in business.

16.     Matsu Corp. purchases and uses food and other products that originate outside of Connecticut.

17.    Matsu Corp. hired, paid, supervised, and scheduled Plaintiffs.  Therefore, it is an "employer" as defined under the FLSA, 29 U.S.C. § 203(d), and Conn. Gen. Stat. §§ 31-58(e) and 31-71a(1).

18.    Defendants Kim Ming Cheng and Ziqiao Cao co-founded Matsu Sushi with non-party individual Lin Yi "Leo" YANG.  Later, Cheng and Cao bought out Yang's stake in the business, and became the sole co-owners of the restaurant.

19.    Over the fifteen years since its establishment, Matsu Sushi has become a highly successful business and a staple dining spot in the town of Westport, Connecticut.  It headlines Westport's annual Restaurant Week events, and has been described as the "best sushi in town" by a local magazine.[1]  It sponsors benefit concerts at Westport's local non-profit performing arts pavilion,[2] and even supports a New England-based breast cancer foundation.[3]

20.    But Matsu's success and profits were built on extreme exploitation.  The Bosses, Defendants Kim Ming Cheng and Ziqiao Cao paid sub-minimum wages and ignored the payment of overtime premiums entirely.

### B.    Matsu Grill Co. LLC and Matsuri

21.    Building upon Matsu's success, the Bosses opened another sushi and hibachi restaurant in Darien, Connecticut, called "Matsuri" in August 2014.  The Bosses operated Matsuri through Matsu Grill Co. LLC, a pre-existing legal entity.

---

[1] See Dave Matlow, *Westport Outdoors: Matsu Sushi*, WESTPORTNOW.COM (May 6, 2014), http://www.westportnow.com/index.php?/v3/comments/westport_outdoors_matsu_sushi/.
[2] See Dave Matlow, *DNR in WVEMS Benefit Friday at Levitt*, WESTPORTNOW.COM (Sept. 8, 2016), http://www.westportnow.com/index.php?/v3/comments/dnr_in_wvems_benefit_friday_at_levitt/.
[3] See Dave Matlow, *Matsu Sushi Supports Breast Cancer Foundation*, WESTPORTNOW.COM (Dec. 7, 2009), http://www.westportnow.com/index.php?/v3/comments/matsu_sushi_supports_breast_cancer_foundation/.

22.     The Bosses diverted some of Matsu's workers to Matsuri.  At first, they transferred Plaintiffs Jianming Jiang and Chunqiu Duan over to Matsuri.  Later, they substituted Mr. Ding for Mr. Jiang.

23.     The Bosses operated Matsuri as a carbon copy of Matsu.  The management structure and business model stayed exactly the same.  With few exceptions, the workers who moved to Matsuri from Matsu worked the same hours and received the same pay.  Thus, any labor violations that occurred at Matsu persisted and proliferated at Matsuri.

24.     Despite its similarity to Matsu, Matsuri did not enjoy the same success.  For much of its existence, business was tepid, and it closed in 2017.

### C.     The Bosses: Kim Ming Cheng and Ziqiao Cao

25.     Defendants Kim Ming Cheng and Ziqiao Cao are co-proprietors of Matsu Corp. They own equal shares in the company.

26.     Mr. Cheng is Matsu Corp.'s President and Director, and its designated agent for the service of process.

27.     Cheng and Cao also co-owned Matsu Grill Co. LLC.

28.     Mr. Cao oversees the day-to-day affairs of the Restaurants.  He is present at Matsu Sushi almost every day of the year. When Matsuri was open, he would come to Matsuri and supervise the workers there from time to time.

29.     Cheng and Cao hired all of the managers at the Restaurants.  They either personally hired, or delegated to the managers to hire, all other employees at the Restaurants.

30.     Cheng and Cao each had the power to discipline and fire employees at Matsu Sushi and Matsuri, and regularly delegated this power to the managers.

31.     Cheng and Cao instructed employees in the performance of their duties from time to time, and routinely delegated such instruction to the Restaurants' managers.

32.     Cheng and Cao were responsible for all salary decisions at the Restaurants.  Cao personally signed any bank checks containing portions of the workers' wages.

33.     Cheng and Cao set the Restaurants' hours of operations, and delegated employee scheduling to the Restaurants' managers.

34.     Cheng and Cao also directed the use of vehicles belonging to Matsu Corp. and/or Matsu Grill Co. LLC as employee commuter shuttles to transport Matsu and Matsuri employees to and from Flushing.  They either personally instructed or delegated to the Restaurants' managers to instruct Plaintiffs Chunqiu Duan and Yongqiang Song to drive the commuter shuttles.

### D.     *Jianming Jiang*

35.     Plaintiff Jianming Jiang was one of Matsu Sushi's first employees.  He began working at the restaurant when it opened in March 2002.

36.     Mr. Jiang worked at Matsu Sushi as a hibachi chef continuously from March 2002 until sometime in 2011.  During this period, he earned a flat salary of $575 per week.

37.     Mr. Jiang resumed employment at Matsu Sushi in October 2013.  He worked at Matsu continuously until August 2014, when Matsuri opened.  Upon the Bosses' request, Mr. Jiang worked at Matsuri from August 2014 until September 2015.  He then returned to Matsu, and continues to work there until now.  During the period since October 2013, the Bosses paid him a weekly salary of $700.

38.     Mr. Jiang worked approximately **69 hours per week** on average during the time he was employed at the Restaurants.

39.     Mr. Jiang's weekly work hours include approximately 63 hours of regularly scheduled shifts, occasional "big shifts" that required extra time, and hours spent purchasing groceries for staff meals.

40.     In addition to his regularly scheduled shifts, Mr. Jiang participated in occasional "big shifts" that lasted 36 hours straight.  These "big shifts" occurred once a month on average. During these shifts, all of the chefs, including Plaintiffs, stay at the restaurant after a full day of service, and work through the night to fulfill large corporate catering orders.  The next day, without having gotten any rest, the chefs have to complete their regular shifts, which last from 11 to 12 hours.

41.     For example, on April 28, 2017, Bridgewater Associates ordered 20,000 pieces of sushi from Matsu for delivery on May 4, 2017.  All of the chefs in the restaurant, including Jiang and Song, worked a 36-hour "big shift" in advance of the delivery date to complete the order.

42.     Between 2014 to 2015, there was a period in which Plaintiffs worked a "big shift" *every week* for six to eight weeks straight.

43.     Mr. Jiang also spent an average of 3 hours a week purchasing groceries for staff meals.  Mr. Jiang shared this duty with Mr. Ding.  Three days a week, Mr. Jiang got up early to purchase groceries before his commute from Flushing to Westport.  Each grocery trip took about an hour.  The Bosses directed Jiang and Ding to buy groceries and cook staff meals fresh every day because of limited fridge space at the restaurant.

44.     The Bosses did not always pay Mr. Jiang the statutory minimum wage under Connecticut law.  For example, during the week of May 1, 2017, when the Matsu chefs worked a "big shift" to complete the Bridgewater order, Mr. Jiang performed 79 hours of work, but was

only paid $700.  That represents an hourly rate of $8.86 per hour at a time when Connecticut's minimum wage was $10.10 per hour.

45.     Despite the fact that he worked 69 hours a week on average, the Bosses never paid Mr. Jiang an overtime premium for any week he worked.  For example, accounting for minimum wage and overtime, the minimum lawful amount the Bosses should have paid Mr. Jiang for the week of May 1, 2017, was $994.85, $294.85 more than his actual salary.

46.     Mr. Jiang had no supervisory or managerial duties at the Restaurants.  He did not have access to the restaurants' books and accounts, and had no authority to fire, discipline, supervise, or set the work schedule for other employees.

47.     The Bosses did not keep accurate records of Mr. Jiang's hours.

### E.     Liguo Ding

48.     Plaintiff Liguo Ding joined Matsu in 2003, and worked there as a hibachi chef until sometime in 2009.  During this period, he earned a flat salary of $525 per week.

49.     Mr. Ding resumed employment at Matsu Sushi in March 2010.  Afterwards, he worked at Matsu continuously until September 2015, when he exchanged places with Mr. Jiang and began working at Matsuri.  Mr. Ding worked at Matsuri until it closed in September 2017.  He then returned to Matsu, and continues to work there.  From 2010 to the present, the Bosses paid Mr. Ding $650 a week.

50.     Mr. Ding worked **69.5 hours per week** on average during the time he was employed at the Restaurants.

51.     Like Mr. Jiang, Mr. Ding's weekly work hours include regularly scheduled shifts—about 63.5 hours, occasional "big shifts" that required extra time, and hours spent purchasing groceries for staff meals.

52.     The Bosses did not always pay Mr. Ding the statutory minimum wage under Connecticut law.  For example, after Mr. Ding returned to Matsu from Matsuri, he worked a "big shift" during the week of September 18, 2017.  As a result, he worked 79.5 hours that week, but was still paid only $650.  That represents an hourly rate of $8.18 per hour at a time when Connecticut's minimum wage was $10.10 per hour.

53.     The Bosses never paid Mr. Ding an overtime premium for any week he worked. For example, accounting for minimum wage and overtime, the minimum lawful amount the Bosses should have paid Mr. Ding during the week of September 18, 2017, was $1002.43, $352.43 more than his actual pay.

54.     Mr. Ding had no supervisory or managerial duties at the Restaurants.  He did not have access to the restaurants' books, and had no authority over any of the other employees.

55.     The Bosses did not keep accurate records of Mr. Ding's hours.

### F.     Chunqiu Duan

56.     Plaintiff Chunqiu Duan began working at Matsu as a sushi chef in 2004, and continuously worked there until sometime in 2010.  During this period, he earned a flat salary of $625 per week.

57.     Mr. Duan resumed employment at Matsu Sushi in April of 2013.  He worked at Matsu until October 2014, when he joined Mr. Jiang at Matsuri.  Mr. Duan continued to work at Matsuri until he quit in April 2017.  During the period since Mr. Duan's return to work, the Bosses paid him a weekly salary of $650.

58.     Mr. Duan worked about **67.5 hours per week** from 2004 to 2010 and from April 2013 to October 2014.  After he started working at Matsuri in October 2014, Mr. Duan worked about **83 hours per week** because his job duties at the restaurant expanded.

10

59.     During his time at Matsuri, Mr. Duan's weekly work hours included 64.5 hours of regularly scheduled shifts as a sushi chef and occasional "big shifts."  Mr. Duan also spent about 15.5 hours per week driving Matsuri's employee commuter shuttle.

60.     After they transferred Mr. Duan to Matsuri, the Bosses asked him to drive the employee shuttle that transported the restaurant's workers to and from Flushing, where they all lived.  The Bosses provided the vehicle—a 15-seat Ford passenger van—and paid for gas.  Every morning, Mr. Duan picked up workers at the parking lot of the Sheraton Hotel in Flushing, the meeting location the Bosses designated.  He had to arrive 1 hour and 20 minutes before the restaurant's opening time for that day.  For example, he was required to pick up the other workers at 9:40 a.m. when the restaurant opened at 11:00 a.m.  At the end of the day, after the restaurant closed, Mr. Duan had to drop off the workers at places closed to where they lived.  It often took him an extra hour to an hour and a half to get back to Flushing as a result.

61.     Mr. Duan asked the Bosses for extra compensation for driving, but the Bosses refused.  Mr. Duan received no extra pay or time off for driving the commuter shuttle.

62.     Mr. Duan's wages from October 2014 to April 2017 almost always failed to satisfy the statutory minimum under Connecticut law.  On weeks when he worked one or more "big shifts," his wages even failed to satisfy the federal statutory minimum.  For example, during at least one week in February 2017, Mr. Duan worked a "big shift."  That week, he performed 93 hours for Matsuri restaurant, but the Bosses still only paid him a flat rate of $650.  That represents an hourly rate of $6.99 per hour, below the federal minimum wage of $7.25 per hour.

63.     The Bosses also never paid Mr. Duan an overtime premium for any week he worked.  For example, during the week in February 2017 in which Mr. Duan worked a "big shift," the Bosses paid him $650 for 93 hours of work.  Accounting for minimum wage and

overtime, the minimum lawful amount the Bosses should have paid Mr. Duan for that week was $1206.95, $556.95 more than what he actually made.

64.     During his employment, Mr. Duan had no supervisory or managerial duties at the Restaurants.  He did not have access to the restaurants' books, and had no authority over any of the other employees.

65.     The Bosses did not keep accurate records of Mr. Duan's hours.

### G.     *Yongqiang Song*

66.     Plaintiff Yongqiang Song began working at Matsu as a sushi chef and driver in January 2011, and continuously worked there until September 2017, when he began taking a leave of absence from the restaurant.  He is still an employee of Matsu Sushi, however, and occasionally goes in to help out when the restaurant is particularly busy.

67.     From 2011 to 2012, Mr. Song earned $700 per week; from 2012 to 2013, $725 per week; from 2013-2016, $750 per week; and finally, from 2016 to the present, $850 per week.

68.     From 2011 until August 2015, Mr. Song worked about **76 hours per week**; from August 2015 until September 2017, he worked **66 hours per week**.

69.     Mr. Song's weekly work hours included regularly scheduled shifts as a sushi chef, occasional "big shifts," driving the employee commuter shuttle for Matsu half the week, and time spent picking up supplies for the restaurant.  Unlike Mr. Duan, who bore the burden of driving Matsuri's workers every day of the week, Mr. Song split the driving duties at Matsu with another employee that is a non-party to this suit.  The Bosses also instructed Mr. Song to pick up groceries and other materials for the restaurant from a wholesale vendor in Flushing twice a week.  Each supply run took approximately one hour.

12

70.     Mr. Song received no extra compensation for his driving and grocery pick-up duties.  From sometime in 2015, the Bosses awarded him a paid day off each month on average for driving.

71.     Like the other workers, the Bosses never paid Mr. Song an overtime premium for any week he worked.  For example, the Bosses paid Mr. Song $850 for 76 hours of work during the week of May 1, 2017, a "big shift" week, which represents an hourly rate of $11.18 per hour with no overtime premium.  Including overtime, the minimum lawful amount the Bosses should have paid Mr. Song for that week was $1,050.92, more than $200 more than his actual salary.

72.     Like the others, Mr. Song had no supervisory or managerial duties at the Restaurants.  He did not have access to the restaurants' books, and had no authority over any of the other employees.

73.     The Bosses did not keep accurate records of Mr. Song's hours.

II.     **Illegal Deprivation of Plaintiffs' Deposit Payments**

A.     *The First Round of Deposits: Jiang, Duan, and Ding around 2007*

74.     In or around 2007, Cheng, Cao, and/or non-party Lin Yi "Leo" Yang, who co-owned Matsu with the Bosses at the time, approached Plaintiffs Jiang, Ding, and Duan individually and asked each of them to contribute at least $25,000 to the restaurant.  The employers pitched the payments as investments that were tied up with the workers' employment at Matsu.  They told the three Plaintiffs that as long as they stayed at the restaurant, each person who paid would be eligible to receive monthly "bonuses" on top of their regular wages when business was good.  They promised that the payments would be returned to the workers in full when they leave Matsu.  Besides the three Plaintiffs, the Bosses and/or Mr. Yang also proposed

the same deal to Pauline Lee, the restaurant's manager at the time, as well as to senior members of Matsu's kitchen and wait staffs.

75.     Attracted by the prospect of receiving additional payments, Jiang, Ding, and Duan each paid $25,000 in cash to the employers in early 2007.  Cash transactions are custom and widely expected within the Chinese immigrant community.  For example, Plaintiffs received most of their wages from the Restaurants in cash.

76.     Around March 2007, after they paid the $25,000, Jiang, Ding, and Duan entered into separate agreements with the employers.  Written in the Chinese language, the contracts were handwritten and lasted less than a page in length.  The contracts specified that for their respective deposit payments, Jiang, Ding, and Duan each received "working shares" equal to five percent (5%) of Matsu Corp.'s common stock.  The value of these 5% stakes were fixed at $25,000, regardless of any change in the restaurant's profitability.  They were not transferable. The majority shareholders—the three employers—reserved the right to buy back the stakes if the workers underperformed at their jobs.  Finally, the agreements stipulated that if the workers wanted to go back to China or otherwise leave Matsu, the majority shareholders would buy back the shares at the original sale price.

77.     On or around March 22, 2007, soon after the workers entered into the Chinese agreements, the employers asked them to sign an English contract, even though none of the workers spoke or read any English.  The English contract was much longer—about 5 pages single-spaced.  It was also typed instead of handwritten.  The employers told the workers that the Chinese contracts controlled, and that the English contract would only be used for documentary purposes.  Representing all three workers, Jiang and Duan signed the English contract.

78.     In each instance, the employers withheld the signed contracts from the workers. The workers do not have access to any copies of the Chinese agreements.  They have access to the English contract only because Matsu's current manager, Maggie Lin, shared a photographed copy with them at a later date.

79.     Even though the contracts the workers signed resembled stock purchase agreements, neither the Chinese nor the English contracts mentioned any stockholder rights.  The employers did not make any of the workers aware of Matsu Corp.'s articles of incorporation or corporate bylaws.  None of the workers received voting power over company affairs.  They had no access to company records.  They were not listed as shareholders of the company in available public records.  They were also barred from transferring their "working shares" to any third party.

80.     Around the same time the contracts were executed, the employers began paying the promised "bonuses" to Jiang, Ding, and Duan.  These bonuses were distinct from the workers' regular pay—they were calculated on a monthly, rather than weekly, basis, and were often paid after the fact.  For example, a worker might receive the August bonus in October.  Only employees who paid the deposits were eligible for the bonuses.

81.     Jiang, Ding, and Duan did not receive bonuses every month.  When they did get paid, the bonus amounts fluctuated.  On average, each worker received about $500 per month in bonuses.  Although the employers claimed that the bonuses were calculated based on the restaurant's profitability, they did not permit the workers access to Matsu's books and accounts, or disclose Matsu's financial information to the workers.  They told the workers that the workers wouldn't be able to understand the financial information even if they provided it.  Each month,

the employers convened with Matsu's manager to determine whether and how much to pay out in bonuses.

82.     The deposit-bonus scheme described above continued for a few years after it was established in 2007.  In 2009, Mr. Ding left Matsu Sushi.  Mr. Duan left in 2010, and Mr. Jiang left in 2011.  The employers refunded all three workers their deposits upon their departure from Matsu Sushi.

83.     Out of the three employers at the time, Mr. Yang ceased involvement in Matsu Corp. and Matsu Sushi sometime around this period.  Cao and Cheng took over all of Mr. Yang's shares in Matsu Corp. and became the co-owners of the business.

### B.     The Second Round of Deposits: Ding, Song, Duan, and Jiang

84.     In or around March 2010, after repeated invitations from the Bosses and/or Matsu's manager, Mr. Ding resumed employment at Matsu Sushi.  At first, the Bosses did not ask Mr. Ding to pay another deposit.

85.     Later, in January 2011, Mr. Song joined Matsu as a new sushi chef and driver. Around this time, both Jiang and Duan left the restaurant.

86.     A few months after Mr. Song joined, the Bosses asked both Mr. Song and Mr. Ding to pay a deposit.  The Bosses told the two workers to pay $30,000 each, or $5,000 more than Mr. Ding paid the first time.  As justification for the increased deposit, the Bosses cited Matsu's booming business and described the opportunity to work at the restaurant as a privilege. The Bosses told the two of them that by paying the $30,000, they would be participating in the same scheme as first round of deposit payments.

87.     In or around October 2011, Mr. Song and Mr. Ding each paid $30,000 in cash to the Bosses.  In addition to all of his savings, Mr. Song had to borrow money from friends and relatives to come up with the full sum.

88.     Even though the Bosses told Ding and Song that the deposit scheme was the same, they refused to enter into written agreements with the two workers this time around. Citing the examples of the workers who had been repaid previously, the Bosses claimed that written agreements were unnecessary, and assured the workers that they would get their money back upon leaving the restaurant.

89.     Meanwhile, Mr. Jiang and Mr. Duan had left the restaurant.  Having gotten their deposits back when they left Matsu, neither worker had any intention to come back to work there.  The Bosses maintained contact with the two workers after their departure.

90.     Sometime in 2012, both Bosses met up with Jiang and Duan.  Over drinks, the Bosses invited the workers to rejoin Matsu, as Mr. Ding had done.  The Bosses promised that everything would be the same as before, implying that Jiang and Duan would again pay deposits and receive monthly bonuses in exchange.

91.     In reality, the Bosses intended to keep Plaintiffs' money and use it as ransom for Plaintiffs' continued employment.

92.     In the end, Jiang and Duan decided to resume employment at Matsu Sushi shortly thereafter.  Mr. Duan rejoined the restaurant in April 2013, and Mr. Jiang came back in October 2013.

93.     In around late 2013, after Mr. Jiang rejoined the restaurant, the Bosses brought up the deposit payments again to both Jiang and Duan.  The Bosses proposed that both workers recommit their original deposits, so that they could receive bonus payouts as they did before.

94.     Thinking that they would get their money back, both Jiang and Duan paid the Bosses $25,000—the same amount they had put in previously.  Mr. Duan paid the Bosses in early 2014 through a friend's bank account in China.  He was short on money, and had to borrow funds from friends and relatives in China to make up the difference.  Meanwhile, Mr. Jiang paid his deposit in cash.

95.     As they did with Mr. Ding and Mr. Song, the Bosses refused to provide any written documentation of Jiang and Duan's deposit payments.  They assured the two of them that even though there was no contract this time, the arrangement stayed the same: the workers would receive monthly bonus payments when business was good, and they would get their money back when they leave the restaurant.  A written agreement was no longer necessary, the Bosses told the workers, because they were already "old friends" and trusted one another.  Since they had gotten their money back previously, Jiang and Duan found no reason to doubt the Bosses.  They trusted that they would be paid when they leave the restaurant.

### C.     Additional Deposits Paid After Matsuri Opened in 2014

96.     In August 2014, the Bosses opened Matsuri in Darien, Connecticut.  Shortly after Matsuri opened, the Bosses solicited additional deposit payments from Plaintiffs.  The Bosses boasted about the expansion and success of their business enterprise.  As a result, they said, Plaintiffs should trust them and contribute more funds.  When Plaintiffs hesitated to pay more money, the Bosses told Plaintiffs that whoever paid deposits for Matsu must also put in deposits for Matsuri.

97.     Acceding to the Bosses' demands, each Plaintiff paid an additional $14,000 in cash to the Bosses within a few months after Matsuri opened.

18

98.     Like the last time they asked Plaintiffs for deposit payments, the Bosses refused to provide contracts or any other type of written proof to Plaintiffs.

99.     The Bosses promised that Plaintiffs would receive bonuses for their contributions to Matsuri in addition to bonus payouts for their previous deposit payments.  However, because of lackluster business, Plaintiffs barely received any bonuses at all from their deposits at Matsuri.  During the entire three years Matsuri was open, Plaintiffs only received approximately $1,000 per person for the $14,000 deposit they paid.

100.     When Matsuri closed in September 2017, the Bosses did not return Plaintiffs their $14,000 deposits.  In fact, the Bosses didn't even explain or mention to the workers what would happen to their money.

101.     In sum, as of the time of this Complaint, the Bosses owe Mr. Song **$44,000**, Mr. Ding **$44,000**, Mr. Duan **$39,000**, and Mr. Jiang **$39,000** in deposit payments.

### D.     Mr. Duan's Departure in April 2017 and Request to Be Repaid

102.     In or around March 2017, Mr. Duan, who had been working approximately 83 hours per week on average for nearly three years as a sushi chef and driver at Matsuri, asked the Bosses if he could switch positions at the restaurant because of his deteriorating eyesight, which interfered with his ability to make sushi.  The Bosses refused to accommodate him.  Left with no other choice, Mr. Duan quit his job.

103.     After Mr. Duan quit, the Bosses did not pay back his $39,000 deposit.  He also stopped receiving bonus payouts from the Restaurants.

104.     The other Plaintiffs became alarmed after learning about the Bosses' failure to repay Mr. Duan.  Over the next three months, Plaintiffs participated in three separate meetings with the Bosses and other restaurant staff who had paid deposits.  Both during and after these

meetings, Plaintiffs repeatedly asserted their property interest in the deposit payments, asked for their money back, and requested that the Bosses provide written guarantees of repayment. The Bosses rebuffed and repudiated Plaintiffs' legitimate demands at every turn.

### E. The Bosses Repeatedly Reject Plaintiffs' Requests for Their Money and Threaten to Abuse the Legal Process: "Your Money Will Be Used to Pay the Lawyers"

i.    The First Meeting: 9:30 p.m. April 26, 2017, at Matsu Sushi

105.    In April, after Mr. Duan left the Restaurants without getting his deposit back, Plaintiffs asked the Bosses for an explanation. In response, the Bosses instructed non-party Maggie Lin, Matsu's manager, to organize a meeting with the workers who had paid deposits.

106.    Ms. Lin is related to Cao—she is married to Cao's brother-in-law—and aligns closely with the Bosses on issues relating to the Restaurants' management. Ms. Lin frequently communicates with Plaintiffs on the Bosses' behalf. She manages a company chat group called "Matsu" on WeChat, a popular Chinese social media application. The chat group includes both Bosses and all of the Restaurants' senior workers, including Plaintiffs. Ms. Lin regularly announces staff meetings and other work-related activities to the workers through the chat group, as well as individual messages on WeChat.

107.    Through the "Matsu" chat group, Ms. Lin summoned the workers to a meeting at Matsu Sushi at 9:30 p.m. on April 26, 2017, after the restaurant had closed for the day.

108.    Both Bosses (defendants Cao and Cheng) attended the April 26 meeting, along with the employees who had paid deposits, including Plaintiffs. Ms. Lin was also present.

109.    At the meeting, the Bosses flat-out refused to recognize that they had received *any* deposit payments from their employees. Capitalizing on the fact that almost all of the deposits had been made in cash, Cao asked if the workers had any proof that he and Cheng had their money. Cao's rhetorical question implied that the Bosses could act with impunity against the

workers.  Playing dumb, Cheng merely smiled and nodded along to Cao's statements.  These actions by the Bosses shocked and infuriated Plaintiffs.

110.    After the meeting, Plaintiffs reached out to Ms. Lin to establish a channel of communication with the Bosses.  Ms. Lin tried to assuage Plaintiffs' concerns.  She told Plaintiffs that despite what Cao said at the meeting, the Bosses would eventually provide a written guarantee of repayment to Plaintiffs.  She said that the Bosses were afraid Plaintiffs would all quit if they were promised their money back and the Restaurants would have to shut down as a result.  Ms. Lin mentioned that Cao was particularly concerned that Plaintiffs might take legal action against him and Cheng.

111.    Because the Bosses had their money, Plaintiffs had no choice but to accept Ms. Lin's explanation.  They decided to give the Bosses some time to come up with a written guarantee of repayment.

      ii.    The Second Meeting: June 3, 2017, at a Chinese Restaurant in Flushing

112.    After repeated delays, the Bosses scheduled another meeting with the workers on June 3, 2017.  The meeting took place at a Chinese restaurant in Flushing.

113.    At the meeting, the Bosses again failed to provide a written guarantee that they would repay the workers, despite Ms. Lin's previous assurances to the contrary.  They told Plaintiffs that they would provide a written agreement "as soon as possible," but refused to set a specific timeline.  When pressed, the Bosses responded in vague and noncommittal terms.  For example, Cheng told the workers: "We will talk it over, and you guys can talk it over too."

114.    Mr. Duan asked the Bosses directly for his $39,000 deposit back.  In response to Mr. Duan's request, both Cao and Cheng became silent.  Thinking that they might not have the money on hand, Mr. Duan asked whether they could pay him within a certain period, such as in

three or six months.  The Bosses again refused to answer his question.  They merely said, "let's talk about it later."

115.    Like the previous meeting, the June 3 meeting ended without a resolution. Afterwards, Mr. Duan called Cheng again to ask when he would get his money back.  In an equivocating tone, Cheng told Duan that he "*ought* to get the deposit," but refused to actually pay him.  Cheng told Mr. Duan to call Cao, who refused to pick up Mr. Duan's phone calls.

iii.    <u>The Third Meeting: July 31, 2017, in Flushing</u>

116.    Frustrated with the Bosses' delay tactics, Plaintiffs repeatedly contacted Ms. Lin and demanded a resolution.  Finally, the Bosses arranged a third meeting with the workers.

117.    The meeting took place on July 31 in Matsu's commuter shuttle, after all the other employees had been sent home.  The shuttle was parked in a lot in Flushing.

118.    During the meeting, the Bosses suddenly announced that Matsuri would closed down.  Shocked, the workers immediately became concerned that those who worked at Matsuri would lose their jobs.  The Bosses also made clear that they had no intention of repaying the workers.  At first, Cao tried to assert that Plaintiffs had already been repaid through their money bonus payments.  Mr. Ding retorted that no one would have paid a deposit just to have his own money returned to him in small increments.  At this point, Cao explicitly told Plaintiffs: "Whoever wants to leave [the Restaurants] can leave, but you won't get your deposit money back."  Thus, the third meeting again ended without a resolution.

119.    About one to two weeks after the July 31 meeting, Ms. Lin called Mr. Jiang and Mr. Song to talk about the workers' demands.  The two Plaintiffs told her that the workers simply wanted assurance of repayment, and that they would seek legal recourse if the Bosses

continued to deny their claims.  Ms. Lin told both Plaintiffs, "If you really want to use legal means, then your deposit will be used to pay the lawyers."

120.    The Bosses intentionally withheld the money and threatened to use it specifically on a meritless legal defense of Plaintiffs' claims in order to coerce Plaintiffs into continuing to work for them.

### F.    The November 10 Demand Letter and the Bosses' Failure to Comply

121.    Despite Ms. Lin's threat, Plaintiffs decided to assert their legal rights.  They sought the assistance of the Flushing Workers Center, a community organization, and retained the undersigned counsel in October 2017.

122.    On November 10, 2017, Plaintiffs delivered a demand letter to the Bosses.  In the demand letter, Plaintiffs restated their request for immediate repayment of their respective deposits: $39,000 for Mr. Jiang, $44,000 for Mr. Ding, $39,000 for Mr. Duan, and $44,000 for Mr. Song; and gave the Bosses seven days to comply.  The letter was written in Chinese by the workers themselves.

123.    Until the date of this Complaint, Defendants have failed to respond whatsoever to Plaintiffs' November 10 demand letter.  Plaintiffs thus respectfully submit this Complaint, and seek relief for their injury.

## CLAIMS FOR RELIEF

## COUNT ONE – TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT
### (Trafficking)

124.    By threatening to use Plaintiffs' *own money* to pay lawyers to prevent Plaintiffs from recovering their deposits—in order scare Plaintiffs into continuing to labor under illegal and abusive conditions—Defendants have violated 18 U.S.C. § 1589, which prohibits obtaining the labor of a person by means of abuse or threatened abuse of the legal process.

23

## COUNT TWO – FAIR LABOR STANDARDS ACT
### (Minimum Wage)

125.     By the conduct described above, Defendants violated Plaintiffs' rights to be paid a minimum wage pursuant to the provisions of the Fair Labor Standards Act, 29 U.S.C. §201, *et seq.*

126.     Defendants' conduct, as described above, was in willful violation of the Plaintiffs' rights pursuant to the Fair Labor Standards Act, 29 U.S.C. §201, *et seq.* As a result of the Defendants' unlawful conduct, Plaintiffs has suffered a loss of compensation from employment that is due and owing to them.

## COUNT THREE – FAIR LABOR STANDARDS ACT
### (Overtime)

127.     By the conduct described above, Defendants violated Plaintiffs' rights to be paid an overtime premium consistent with the provisions of the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*

128.     Defendants' conduct as described above was in willful violation of Plaintiffs' rights pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*  As a result of the Defendants' unlawful conduct, Plaintiffs suffered a loss of compensation from employment that is due and owing to them.

## COUNT FOUR – CONNECTICUT MINIMUM WAGE ACT
### (Minimum Wage)

129.     By the conduct described above, Defendants violated Plaintiffs' rights to be paid a minimum wage with the provisions of the Connecticut Minimum Wage Act, Connecticut General Statutes § 31-58, *et seq.*

130.     Defendants' actions as described above were made in bad faith, and were arbitrary and/or unreasonable.  As a result of Defendants' unlawful conduct, Plaintiffs have

suffered a loss of compensation from employment that is due and owing to them.

## COUNT FIVE – CONNECTICUT GENERAL STATUTES § 31-58, *et seq.* (Overtime)

131.    By the conduct described above, Defendants have denied Plaintiffs overtime wages in violation of Conn. Gen. Stat. §§ 31-60a and 31-76c.

132.    Defendants' violation of the Connecticut General Statutes was made in bad faith, and was arbitrary and/or unreasonable.

133.    As a result of Defendants' unlawful conduct, Plaintiffs suffered a loss of compensation from employment that is due and owing to them.

## COUNT SIX – CONVERSION

134.    Plaintiffs, being the owners and in possession of cash money in the amount of $39,000 or $44,000, delivered the same to Defendants to be held as deposit payments.  Plaintiffs and Defendants agreed that the deposits would be returned to Plaintiffs upon Plaintiffs' departure from the Restaurants or when Plaintiffs demanded their return, whichever is earlier.

135.    Although Plaintiffs are entitled to their deposit payments, and has repeatedly demanded their repayment since April 2017, Defendants have neglected and refused to return the deposits to Plaintiffs.  Defendants have thereby converted the deposit payments to their own use.

## COUNT SEVEN – STATUTORY THEFT

136.    Defendants' actions constitute statutory theft pursuant to Conn. Gen. Stat. § 52-564, in that:

(a)    Defendants intentionally assumed unauthorized control of Plaintiffs' deposit payments in the amount of $39,000 or $44,000, to the exclusion of Plaintiffs; and

    (b)     Defendants continue their wrongful possession and control of, and has

               failed and refused to surrender and deliver the deposit payments to

               Plaintiffs.

137.    As a result, Plaintiffs have suffered ascertainable damages.

## COUNT EIGHT – COMMON LAW FRAUD

138.    In three separate instances in or around October 2011, early 2014, and late 2014, Defendants falsely and fraudulently promised Plaintiffs that they would pay back Plaintiffs' deposit payments in full upon Plaintiffs' departure from employment at the Restaurants, or when Plaintiffs so demand, whichever is earlier. In fact, Defendants had no intention of paying Plaintiffs' deposit payments back to Plaintiffs.

139.    When Defendants' made their false promises and when Plaintiffs paid the deposits, Plaintiffs were ignorant of Defendants' secret intention not to perform. Plaintiffs could not, in the exercise of reasonable diligence, have discovered Defendants' secret intention. Plaintiffs relied upon the Defendants' false promises and paid deposits totaling $39,000 or $44,000 to Defendants. If Plaintiffs had known of Defendants' actual intentions, Plaintiffs would not have taken such actions.

140.    As a result of Defendants' fraud and deceit, Plaintiffs have suffered damages and financial harm.

## COUNT NINE – CONNECTICUT UNFAIR TRADE PRACTICES ACT

141.    Defendants' conduct constitutes unfair or deceptive trade practices within the meaning of the Connecticut Unfair Trade Practices Act (CUTPA), Conn. Gen. Stat. § 42-110b, *et seq.*, in that their actions were immoral, oppressive, unscrupulous, and caused substantial injury and ascertainable losses to Plaintiffs.

## COUNT TEN – BREACH OF ORAL CONTRACT

142.    In or around October 2011, Plaintiffs Liguo Ding and Yongqiang Song entered into an oral agreement with Defendants.  To the extent applicable, the oral agreement restated the terms of the 2007 Chinese language agreement between Defendants and Plaintiffs Liguo Ding, Chunqiu Duan, and Jianming Jiang, except that the deposit sum was changed from $25,000 per person to $30,000.

143.    In or around early 2014, Plaintiffs Jianming Jiang and Chunqiu Duan entered into a separate oral agreement with Defendants.  To the extent applicable, this oral agreement similarly restated the terms of the 2007 Chinese language agreement between Defendants and Plaintiffs Liguo Ding, Chunqiu Duan, and Jianming Jiang.

144.    In or around late 2014, each Plaintiff entered into an additional oral agreement with Defendants.  This additional oral agreement stated that in exchange for a deposit payment of $14,000, each Plaintiff would be entitled to periodic bonus payouts based on the profitability of Matsuri restaurant, and that Plaintiffs would be entitled to a full refund of their deposits when they left the Bosses' employment.

145.    Defendants breached the oral contracts described above when they failed to repay Plaintiffs' deposits despite Plaintiffs' repeated demands to be repaid after April 2017.

146.    As a result of Defendants' breaches, Plaintiffs have suffered damages and financial harm.

## COUNT ELEVEN – UNJUST ENRICHMENT

147.    By the conduct described above, Defendants have been unjustly enriched in their unconscionable retention and wrongful misappropriation of Plaintiffs' cash deposits.

148.    As a result of Defendants' actions, Plaintiffs have suffered damages and financial

harm.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request judgment on all counts against Defendants as follows:

1.      All compensation due and owing to them by Defendants;

2.      All damages suffered as a result of Defendants' coercion of Plaintiffs' labor by means of abuse or threatened abuse of the legal process under Count One, pursuant to 18 U.S.C. § 1595;

3.      Liquidated damages in equal amount to their unpaid minimum and overtime wages, pursuant to 29 U.S.C. § 216(b);

4.      Double damages for any violation of Conn. Gen. Stat. § 31-76c, pursuant to Conn. Gen. Stat. § 31-68;

5.      Double damages for any violation of Conn. Gen. Stat. § 31-71, pursuant to Conn. Gen. Stat. § 31-72;

6.      Money damages under Count Six resulting from Defendants' conversion of Plaintiffs' property interest in the deposit payments;

7.      Treble damages under Count Seven for any violation of Conn. Gen. Stat. § 53a-119, pursuant to Conn. Gen. Stat. § 52-564;

8.      Money damages under Count Eight for Defendants' fraudulent representations and false promises against Plaintiffs;

9.      Money damages under Count Ten resulting from Defendants' breaches of their oral contracts with Plaintiffs;

    10.     Money damages under Count Eleven resulting from Defendants' unjust enrichment;

    11.     Plaintiffs' costs and reasonable attorney's fees pursuant to 18 U.S.C. § 1595, 29 U.S.C. § 216(b), Conn. Gen. Stat. §§ 31-68 and 31-72, and Conn. Gen. Stat. § 42-110g;

    12.     Punitive damages;

    13.     Nominal damages; and

    14.     Such other legal or equitable relief as the Court may deem just.

DATED: December 4, 2017              Respectfully submitted,

                                   THE PLAINTIFFS

                       By:     _/s/_____

                                James Bhandary-Alexander
                                Bar No.: Ct28135
                                New Haven Legal Assistance Association
                                426 State Street
                                New Haven, CT 06510
                                Tel: (203) 946-4811
                                Fax: (203) 498-9271
                                Email: jbhandary-alexander@nhlegal.org

CERTIFICATE OF SERVICE

    I hereby certify that on December 4, 2017, a copy of the foregoing Motion was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

                         _____/s/_____

                         James Bhandary-Alexander