UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| JIANMING JIANG;<br>LIGUO DING;<br>CHUNQIU DUAN; and<br>YONGQIANG SONG,<br><br>        Plaintiffs,<br><br>v.<br><br>MATSU CORP.;<br>KIM MING "MARTY" CHENG; and<br>ZIQIAO "MICHAEL" CAO,<br><br>        Defendants. | Civil Action No. 3:17-cv-02011 (SRU)<br><br>March 22, 2018 |

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF
THEIR APPLICATION FOR PREJUDGMENT REMEDY**

In response to Defendants' recent filings, Plaintiffs respectfully submit this Reply in support of their Application for Prejudgment Remedy ("PJR Motion"). *See* Doc. No. 8. This memo seeks to (1) identify key facts that the parties agree upon, and those in dispute; (2) clarify the legal standard for PJR; and (3) refute the defenses asserted by the Defendants in their Answer and Affidavit in Opposition.

**BACKGROUND AND SUMMARY OF FACTS**

Plaintiffs filed their Complaint in the present case on December 4, 2017. They filed the PJR Motion currently before the Court on December 19. Defendants did not respond to Plaintiffs' Complaint or Motion until March 13, 2018, more than a month after the filing deadline. Their Answer was followed by an Affidavit in Opposition from Defendant Kim Ming Cheng. *See* Doc. No. 24. In their filings, Defendants dispute some of Plaintiffs' allegations, but agreed in large part with Plaintiffs' description of the events. In particular, they admit to the following facts:

1

First, Defendants admit that individual Defendants Cheng and Cao own equal shares in Matsu Sushi, Ans. ¶ 25, and that they were part of the ownership of Matsuri restaurant, Ans. ¶ 27. Cheng serves as Matsu Corp.'s President, Director, and its agent of process. Ans. ¶ 26; Compl. ¶ 26. Meanwhile, Cao manages the day-to-day affairs of both restaurants. Ans. ¶ 28; Compl. ¶ 28.

Second, Defendants appear to accept in total Plaintiffs' allegations concerning Plaintiffs' respective periods of employment, wages, and job duties. For example, Defendants admit that Plaintiff Jiang worked at Matsu Sushi continuously as a hibachi chef from March 2002 to sometime in 2011 while earning a salary of $575 per week, Ans. ¶¶ 35-36; Compl. ¶¶ 35-36; that he worked at both Matsu Sushi and Matsuri, Ans. ¶ 37; Compl. ¶ 37; and that he purchased groceries for staff members in addition to his regular duties as a hibachi chef. Ans. ¶ 39. Similarly, Defendants admit or fail to deny Plaintiffs' allegations regarding the employment, job responsibilities, and wage of the other three Plaintiffs. Ans. ¶¶ 43- 69. Notably, Defendants admit that all four Plaintiffs participated in fulfilling big orders, which required them to work continuous 36-hour shifts. Ans. ¶ 41; Compl. ¶ 41.

Third, Defendants admit that they received $30,000 each from Plaintiffs Song and Ding sometime in 2011 as part of a so-called "investment" scheme into Matsu Corp. Ans. ¶ 87; Compl. ¶ 87. Defendants also admit that in late 2013 or early 2014, they actively solicited and received $25,000 each from Plaintiffs Jiang and Duan. Ans. ¶¶ 93-94; Compl. ¶¶ 93-94. Defendants further admit that they actively solicited and received $14,000 from each Plaintiff around the time Matsuri opened in August 2014. Ans. ¶¶ 97-98; Compl. ¶¶ 97-98. (The parties contest the nature of these payments.) In his affidavit, Mr. Cheng alleges slightly different amounts of funds received: "about $25,000 each" for Matsu Corp., and "between $14,000 and $19,000" per person after Matsuri opened in August 2014. Defs.' Aff. ¶ 6. But on the whole, Defendants do not contest having received approximately $39,000 to $44,000 from each Plaintiff.

Finally, Defendants admit that they rebuffed Plaintiffs' repeated requests for their money back. Defendants agree that the parties participated in several meetings, during which they rejected Plaintiffs' explicit demands. These meetings occurred on April 26, June 3, and July 31 of 2017. Ans. ¶¶ 104-105, 107-109, 112-118; same paragraphs in the Complaint. Defendants also admit to having received a demand letter from Plaintiffs on or about November 10, 2017, demanding repayment of all the deposits they received from Plaintiffs. Ans. ¶ 122; Compl. ¶ 122. While Mr. Cheng's affidavit alleges that he and Cao met with Plaintiffs on August 10 instead of the dates listed above, Defs.' Aff. ¶ 8, the parties agree on the essential point: Plaintiffs made explicit demands for their money back, and Defendants refused.

Against the backdrop of the uncontested facts described above, the parties dispute the following issues, *inter alia*:

(1) The parties contest the significance of the March 22, 2007, English language Stock Transfer Agreement between Defendants and Plaintiffs Jiang and Duan. *See* Defs.' Aff. Ex. A. Defendants claim that "[t]he terms of that agreement are the issues causing disputes among the parties," Defs.' Aff. ¶ 5, even though Plaintiff Song did not join Matsu Sushi until four years later, and never signed onto the agreement. In contrast, Plaintiffs allege that a one-page *Chinese language* contract, not the English agreement, controlled parties' deal at the time. Compl. ¶ 76. (Plaintiffs do not have access to the Chinese contract. Compl. ¶ 78.) Plaintiffs Jiang and Duan only signed the English agreement because "[Cheng and Cao] told [them] that the Chinese contracts controlled, and that the English contract would only be used for documentary purposes." Compl. ¶ 77. None of the Plaintiffs speak or read English, and they did not comprehend the English contract's contents. *Id.*

Moreover, even if that agreement at one point had legal force, it is totally irrelevant to the claims in *this* case. Defendants admit that it describes a transaction

that *precedes* the present dispute: "when plaintiff(s) left the employ of Matsu Corp. [around 2009 to 2011], . . . Matsu Corp. purchased their shares [back]." Ans. ¶ 82; Compl. ¶ 82. Plaintiffs contest the characterization of Defendants' refunds, but Defendants' admission clearly indicates that whatever transaction the English agreement contemplated, it had already concluded by this point. Any subsequent dealings between the parties—including the "second round" of deposits—would require new agreements, which Defendants repeatedly refused to execute with Plaintiffs. *See* Compl. 88, 95, 98.

(2) The parties dispute the content of their agreement over the deposit payments complained of. As noted, Defendants claim that the provisions of the 2007 English contract are still applicable. But Plaintiffs allege that they acceded to Defendants' oral promises each time they paid the deposits. Compl. ¶¶ 142-46. These oral promises reflected the *Chinese language* contract that the parties signed in 2007. As Plaintiffs understand it, the key tenets of the parties' agreement were:

   a. The employee pays a sum of $_____ to his employers;

   b. In exchange, he receives periodic "bonus" payments on top of his regular wages based on the profitability of the restaurant; and

   c. He is entitled to a full refund of his deposit at the time of his departure from the restaurant, which is fully voluntary and can occur at any time.

(3) The parties dispute whether Plaintiffs performed a supervisory or management role at the restaurants. Mr. Cheng alleges that Plaintiffs "were managers in the restaurant," and "controlled the activities" of other employees in their respective work areas. Defs.' Aff. ¶ 15. Plaintiffs disagree. Plaintiffs deny performing any supervisory or managerial duties, or having any authority to hire, fire, discipline, or schedule other employees. Compl. ¶¶ 46, 54, 64, 72.

4

## LEGAL STANDARD

Under Connecticut law, a court can grant an application for prejudgment remedy if it "finds that the plaintiff has shown probable cause that such a judgment will be rendered in the matter in the plaintiff's favor in the amount of the prejudgment remedy sought." Conn. Gen. Stat. § 52–278d(a).

The standard for prejudgment remedy is probable cause. "Probable cause is a flexible common sense standard. It does not demand that a belief be correct or more likely true than false." *TES Franchising, LLC v. Feldman*, 943 A.2d 406, 411 (Conn. 2008) (internal quotation omitted). Instead, it simply denotes "a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it." *Walpole Woodworkers, Inc. v. Atlas Fencing, Inc.*, 218 F. Supp. 2d 247, 249 (D. Conn. 2002) (citation omitted).

Contrary to Defendants' suggestion, a showing of "extraordinary circumstances that require immediate action," Defs.' Aff. ¶ 4, is neither necessary nor particularly relevant to a prejudgment remedy determination.

## ARGUMENT

**I. Plaintiffs have already introduced sufficient evidence to establish probable cause.**

    A. <u>Existing evidence supports probable cause that Plaintiffs will prevail on their wage- and deposit-related claims.</u>

        *i. Existing evidence supports probable cause with regard to Plaintiffs' wage claims.*

Plaintiffs set forth four claims for back wages under the Fair Labor Standards Act (FLSA) and the Connecticut wage and hour statutes. Compl. ¶¶ 125-33. To establish probable cause, Plaintiffs need only provide objectively believable evidence regarding their hours and wages. In their submissions to the Court, the parties substantially agree as to Plaintiffs' periods of

employment and wages earned. Additionally, Defendants admit to having worked them 36-hour "big shifts."

> *ii. Existing evidence supports probable cause with regard to Plaintiffs' deposit claims.*

Plaintiffs allege various intentional torts and statutory violations related to their deposit payments. Compl. ¶¶ 124, 134-48. The parties substantially agree that such payments were made at the times alleged by Plaintiffs; they also agree that Defendants repeatedly rebuffed Plaintiffs' demands for their money back.  If necessary, Plaintiffs can further testify as to: (1) the content of their agreements with Defendants, as they understand it; (2) the role of the 2007 English language and Chinese language contracts; (3) Defendants' representations to them prior to and after payment; and (4) Defendants' retaliatory actions against them after they demanded their money back.

> B. <u>Damages estimates in Plaintiffs' PJR application are reasonable and not overly burdensome.</u>

The $310,000 PJR requested represents a highly conservative estimate of a potential judgment. The proposed remedy includes only two years of back pay, plus the amount of unpaid deposits owed to each Plaintiff. It does not include costs, attorney's fees, or punitive damages. Many of the affirmative defenses raised in Defendants' Answer, such as determination of willfulness and the statute of limitations, do not lower the PJR amount even if proven. Ans. ¶¶ 150-51, 153. Plaintiffs challenge these and all others defenses offered by Defendants. In the following Section, Plaintiffs refute three particular arguments that Defendants raised.

**II.   Defendants' asserted defenses are inapposite and should not reduce the PJR amount.**

> A. <u>The March 22, 2007, Agreement is moot, and in any case does not bind the Plaintiffs.</u>

Defendants attempt to spin Plaintiffs' deposit-related claims into an investor dispute surrounding the terms of the 2007 English language agreement. *See* Defs.' Aff. ¶¶ 5-11. But as

noted *supra*, the 2007 contract does not apply to the dispute at bar. First, another document—the Chinese language contract—governed the transaction between Defendants and three Plaintiffs. Second, the English contract would have been voidable, because it was fraudulently induced. Third, even if the contract were somehow applicable, it has since been mooted by the satisfaction of all duties and obligations contained therein. The parties substantially agree that their 2007 transaction concluded between 2009 to 2011, when Defendants repaid the Plaintiffs who signed the contract. *See* Ans. ¶ 82; Compl. ¶ 82. As Defendants acknowledge, the present dispute concerns deposit payments that were made between 2011 and 2014, which were made on the basis of oral agreements between the parties.

> B. As chefs with no management duties, Plaintiffs were non-exempt employees under federal and Connecticut law.

Both the FLSA and Connecticut law require employers to pay their employees a minimum hourly wage, and to pay additional wages for work performed in excess of forty hours a week. 29 U.S.C. §§ 206, 207; Conn. Gen. Stat. § 31-58 *et seq.* Defendants argue that Plaintiffs "are managers and are exempt employees from the protection of the FLSA and Connecticut labor laws." Ans. ¶ 157; *see also* Defs.' Aff. ¶ 15. This amounts to the "executive exemption" to the FLSA's wage requirements. In order to qualify as an "executive," the employee must be someone

> (1) who is paid a salary of at least $455 per week;
> (2) whose "primary duty is management" of the employee's company or department or subdivision thereof;
> (3) who "customarily and regularly directs the work" of at least two other employees; and
> (4) who "has the authority to hire or fire other employees or whose suggestions and recommendations" regarding such decisions are accorded "particular weight."

*Arasimowicz v. All Panel Systems, LLC*, 948 F.Supp.2d 211, 217 (quoting 29 C.F.R. § 541.100). A parallel exemption exists under Connecticut law. Conn. Gen. Stat. § 31-58(e). Courts interpret the federal and state law provisions similarly. *See Hendricks v. J.P. Morgan Chase Bank*, N.A., 677 F.Supp.2d 544, 560 (D. Conn. 2009). The executive exemption is an

affirmative defense. Thus, "the burden of invoking these exemptions rests upon the employer." *Bilyou v. Dutchess Beer Distributors, Inc.*, 300 F.3d 217, 222 (2d Cir. 2002) (citation omitted). Further, "the exemptions to the FLSA are narrowly construed against the employers seeking to assert them." *Id.*

Thus, in order to take advantage of this exemption, Defendants must prove that Plaintiffs' primary duty was managing other employees, not cooking; that they directed the work of at least two other employees; and that they had the authority to hire and fire other employees. Testimony will show that none of these criteria can be satisfied.

Courts within this Circuit "have found that a chef's 'primary duty' is not management where his duties primarily entail cooking." *Karropoulos v. Soup du Jour, Ltd.*, 128 F.Supp.3d 518, 530 (E.D.N.Y. 2015) (surveying cases). In particular, courts have ruled that sushi chefs whose main role is not managing others and who have not attained specialized academic degrees are entitled to minimum wage and overtime protections under federal and state law. *See, e.g.*, *Solis v. Suroc, Inc.*, 49 F.Supp.3d 502 (N.D. Ohio 2014).

C. Defendants' *in pari delicto* defense is inapplicable and designed to intimidate Plaintiffs.

In addition to the above defenses, Defendants argue that Plaintiffs' claims should be dismissed due to alleged tax and immigration fraud according to the *in pari delicto* or "unclean hands" doctrine. Ans. ¶ 156; Defs.' Aff. ¶ 16. The argument is worse than meritless—it creates an impermissible chilling effect and inhibits Plaintiffs' ability to vindicate their legal rights.

*In pari delicto* is an equitable defense that "can only be asserted with respect to equitable—not legal—claims." *Uto v. Job Site Services Inc.*, 269 F.R.D. 209, 213 (E.D.N.Y. 2010) (citation omitted). Other courts in this Circuit have refused to apply this doctrine to statutory claims under the FLSA and state labor law. *Id.*; *see also Torres v. Gristede's Operating Corp.*, 628 F.Supp.2d 447, 464 (S.D.N.Y. 2008) (unclean hands defense "inapplicable" where

8

"the Court need not invoke its equitable powers to adjudicate Plaintiffs' statutory claim[s]."). Further, the doctrine only disposes of a claim when "the plaintiff has been a significant participant in the subject wrongdoing, bearing at least equal responsibility for the violations he seeks to redress." *Carney v. Lopez*, 933 F.Supp.2d 365, 377 (D. Conn. 2013). Thus, to apply the doctrine, (1) the plaintiff's alleged wrongdoing must bear a direct relationship with his injury; and (2) the harm caused by his conduct must at least be comparable to that of the defendant.

Here, the "unclean hands" defense clearly does not apply to Plaintiffs' statutory claims. To preclude Plaintiffs' other claims under this theory, Defendants must show that Plaintiffs' alleged wrongdoing relates directly to their loss wages and missing deposit payments. They must also prove that Plaintiffs share at least equal responsibility for the harm suffered. Defendants have not provided any evidence to that effect, and will be unable to do so at the hearing.

Indeed, this line of argument is likely designed to enable cross examination of Plaintiffs regarding their tax returns and immigration status. Such inquiries would produce a prejudicial effect that greatly outweighs their probative value. Courts in this Circuit have long recognized the substantial *in terrorem* effect of allowing inquiry into plaintiffs' immigration status in FLSA cases. *See, e.g.*, *Flores v. Amigon*, 233 F.Supp.2d 462, 463 (E.D.N.Y. 2002) (granting protective order prohibiting discover into plaintiff's immigration status). Meanwhile, Plaintiffs' tax returns are likely irrelevant to their labor claims. *See Uto v. Job Site Services Inc.*, 269 F.R.D. at 211-12 (finding that plaintiffs' income tax returns are not relevant to their FLSA claims).

**III.   This court should not exempt individual Defendants' assets from attachment.**

Defendants argue that any PJR order should not encompass the personal assets of individual Defendants Cao and Cheng, for two reasons. First, they claim that attaching their assets is unnecessary, because the market value of Matsu Sushi exceeds the value of the PJR application. Defs.' Aff. ¶ 3. Second, they contend that freezing individual assets would be "overbroad, oppressive and unnecessary even by plaintiffs' calculations and claims." *Id.*

Neither rationale withstands scrutiny. Notwithstanding their proclamations regarding Matsu Sushi's market value, Defendants have so far failed to provide Plaintiffs any verifiable information about Matsu Corp.'s assets and liabilities. Without knowledge of each Defendant's ability to pay, it would be inappropriate to foreclose the possibility of attaching individual Defendants' assets.

Furthermore, attaching individual Defendants' assets would not be overbroad or unduly burdensome. The purpose of a prejudgment remedy is "to secure the satisfaction of a judgment should the plaintiff prevail." *Roberts v. TriPlanet Partners, LLC*, 950 F. Supp. 2d 418, 420 (D. Conn. 2013) (citation omitted*)*. Exempting certain defendants from the PJR would frustrate this purpose. Courts regularly attach individual defendants' assets when they themselves may be found liable for an injury or tort. *See, e.g.*, *Morris v. Cee Dee, LLC*, 877 A.2d 899, 908 (Conn. App. Ct. 2005) (upholding a PJR order attaching individual defendant's assets when the trial court found probable cause that the defendant was personally negligent). Here, the Court may hold individual Defendants liable for each and every one of Plaintiffs' claims. Therefore, individual Defendants' assets—as well as that of Matsu Corp.—should be subject to attachment if the PJR is granted.

DATED: March 22, 2018                    Respectfully submitted,


                                                      _/s/_____

James Bhandary-Alexander, ct28135
Chris Zheng, Law Student Intern
New Haven Legal Assistance Association
426 State Street
New Haven, CT 06510
Tel: (203) 946-4811
Fax: (203) 498-9271
Email: jbhandary-alexander@nhlegal.org

**CERTIFICATE OF SERVICE**

I hereby certify that on March 22, 2018, a copy of the foregoing Supplementary Notice was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

_/s/_____

James Bhandary-Alexander